UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                        :

GFI BROKERS, LLC,              :

                        :

              <u>Plaintiff</u>,   :

                        :

     -v.-               :        06 Civ. 3988 (GEL)

                        :

JOHN P. SANTANA,         :

                        :

              <u>Defendant</u>.   :

                        :

------------------------------------------------------------x     **OPINION AND ORDER**
                        :

GFI BROKERS, LLC,              :

                        :

              <u>Plaintiff</u>,   :

                        :

     -v.-               :        06 Civ. 4611 (GEL)

                        :

OFIR ELIAS FILHO a/k/a OFIR ELIAS,  :
TRADITION BRASIL CONSULTORIA    :
EMPRESARIAL, LTDA d/b/a TRADITION  :
BRAZIL,                   :

                        :

              <u>Defendants</u>.  :

                        :

------------------------------------------------------------x

Lawrence F. Carnevale, Mark R. Zancolli, and
Sandra Bourgasser-Ketterling, Carter Ledyard &
Milburn LLP, New York, NY, <u>for plaintiff</u>.

M. Christine Carty and Seth E. Spitzer, Schnader
Harrison Segal & Lewis LLP, New York, NY,
<u>for defendant John P. Santana</u>.

Richard F. Lawler, Shari Markowitz Savitt, and
Melissa A. Gabriel, Winston & Strawn LLP,
New York, NY, <u>for defendant Tradition Brazil</u>.

Steven Johnson and Derek McNally, Kennedy
Johnson & Gallagher LLP, New York, NY,
<u>for defendant Ofir Elias</u>.

GERARD E. LYNCH, <u>District Judge</u>:

These consolidated actions concern an employment contract between plaintiff GFI Brokers, LLC, and defendant John P. Santana. GFI alleges that Santana breached his obligations by quitting his job with GFI and starting work for defendant Tradition Brazil, and that Tradition Brazil and defendant Ofir Elias tortiously interfered with the contract. GFI moves for partial summary judgment that Santana is liable for the breach and that a liquidated damages provision in the contract is enforceable. Defendant Santana cross-moves for partial summary judgment that the liquidated damages provision is not enforceable. Defendants Tradition Brazil and Elias cross-move for partial summary judgment that the liquidated damages provision is not enforceable and not applicable to them. For the following reasons, GFI's motion is granted in part and denied in part, Santana's motion is denied in its entirety, and Tradition Brazil and Elias's motion is granted in part and denied in part.

## BACKGROUND

Plaintiff GFI Brokers, LLC ("GFI"), is a broker of financial products, earning commissions for facilitating trades among its large financial institution customers. (Brown Aff. ¶ 3.) Starting in 2003, GFI employed defendant Santana in brokering currency options for its customers. (<u>Id</u>. ¶ 6; Carty Aff. Ex. J at 76-77.) Santana at that time had twenty years' experience working in emerging markets products at four different firms. (Carty Aff. in Opp'n Ex. E ¶ 3.) Santana worked in GFI's New York office, though his focus was on emerging markets, particularly Brazil. (Brown Aff. ¶ 4.) Santana is fluent in Portuguese, and he regularly traveled to Brazil to meet with and solicit customers. (<u>Id</u>. ¶ 7; Carnevale Decl. Ex. 8 at 153-59.)

From 2003 to 2005, Santana worked for GFI without a written agreement, but on or about October 15, 2005, he entered into a written contract (the "Agreement") under which he agreed to work exclusively for GFI until October 15, 2007. (Brown Aff. Ex. A ¶¶ 1, 2(A).) The Agreement restricts Santana's ability to solicit GFI customers or work for GFI competitors, during the term of the Agreement and for four months afterward. (Id. ¶ 5(E).)

In particular, the Agreement provides that Santana is to refrain "directly or indirectly":

> (i) from accepting business from, doing business with, inducing or soliciting any GFI Customers to whom [Santana] rendered any services during the course of [Santana's] employment with GFI under this Agreement . . . to do business with [Santana], or with any other person or entity, in competition with the type of services performed by [Santana] for GFI [and];

> (ii) from having any interest in or association with any brokerage business competitive with any business of GFI . . . in which [Santana] performed brokerage services as an employee of GFI . . . , whether as a shareholder, director, officer, employee, partner, proprietor, joint venturer, consultant or otherwise, anywhere within 50 miles of any GFI office in which [Santana] provided services to GFI.

(Id.) Should Santana breach either the first clause (the "Non-Solicitation Clause") or the second (the "Non-Competition Clause"), the Agreement provides for "liquidated damages," calculated as the greater of:

> the product of (x) the monthly average of [Santana's] Net Revenues for the twelve (12)-month period immediately preceding the termination of [Santana's] employment with GFI . . . , and  (y) the number of months remaining unfulfilled under this Agreement and the term of any prohibition contained in [the Non-Solicitation Clause and the Non-Competition Clause]

or

> the Net Revenues earned by [Santana] or by [Santana's] new employer as a result of [Santana's] efforts during the same time period described above.

(Id. ¶ 5(F)(ii).)  The Agreement is governed by New York law.  (Id. ¶ 10.)

Prior to the expiration of the Agreement, on or about May 22, 2006, Santana informed GFI that he was resigning.  (Carnevale Decl. Ex. 3 at 151.)  Shortly thereafter, in August 2006, Santana started work in Sao Paulo, Brazil, as a consultant for Tradition Brazil.  (Carty Aff. in Opp'n Ex. A at 66.)  Tradition Brazil is owned and controlled by Tradition NA, a competitor of GFI based in New York City.  (Pl. R. 56.1 Statement ¶¶ 7-8.)  Pursuant to an agreement with Tradition NA, Tradition Brazil provides, "on an exclusive basis" to Tradition NA, "certain consultancy and marketing services . . . in Brazil."  (Carnevale Decl. Ex. 13 ¶ 1.1.)

Santana's job at Tradition Brazil is to broker non-deliverable forwards ("NDFs"), which are currency-based financial products similar to the currency options he was brokering at GFI.  (Pl. R. 56.1 Statement ¶¶ 62-63.)  While there are technical differences between options and NDFs, both are means of trading in foreign currencies.  (Id. ¶¶ 63-65.)  While working for Tradition Brazil, Santana has solicited business from and brokered NDF transactions on behalf of traders at financial institutions that he was responsible for servicing while employed by GFI.  (see id. ¶¶ 67-70; Carnevale Decl. Ex. 24-25.)

In its suit against Santana, GFI alleges that he breached his obligations under the Agreement by (1) quitting GFI before the end of the Agreement term, (2) soliciting GFI customers in contravention of the Non-Solicitation Clause, and (3) working for a GFI competitor in contravention of the Non-Competition Clause.  (See Compl. in GFI Brokers v. Santana ("Santana Compl.") ¶ 1.)  In its suit against Tradition Brazil and its CEO Elias, GFI alleges that the two tortiously interfered with the Agreement.  (See Compl. in GFI Brokers v. Elias and Tradition Brazil ("Tradition Brazil Compl.") ¶ 1.)  GFI moves for partial summary judgment that

Santana breached the Agreement and that the liquidated damages provision is enforceable. (Pl. Mem. 1.) Santana opposes the motion, contending that he left GFI only after it had materially breached its obligations under the Agreement, that he has not solicited GFI's customers, and that his work for Tradition Brazil is not competitive with GFI. (Santana Opp'n 1-3.) Santana also moves for summary judgment that the liquidated damages provision is unenforceable as a matter of law. (Id. 2-3.) Tradition Brazil and Elias move separately for partial summary judgment that the liquidated damages provision is unenforceable and in any event not applicable to them. (Tradition Brazil Mem. 1.)

## DISCUSSION

### I.       Summary Judgment Standard

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the initial burden of explaining the basis for its motion and identifying those portions of the record which it believes "demonstrate the absence of a genuine issue of material fact." Id. at 323. The burden then shifts to the nonmovant to produce evidence sufficient to create a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e)(2). See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Affidavits in support of or opposed to

summary judgment must be based on "personal knowledge" and set forth "facts that would be admissible in evidence."  Fed. R. Civ. P. 56(e)(1).

A court's responsibility is to determine if there is a genuine issue to be tried and not to resolve disputed issues of fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Shade v. Housing Auth. of City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001).  An issue is material if it "might affect the outcome of the suit under the governing law."  Id.  A court must draw all "justifiable inferences" in the nonmovant's favor, and construe all of the facts in the light most favorable to the nonmovant.  Anderson, 477 U.S. at 255.  However, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to withstand a motion for summary judgment.  Id. at 252.

## II.    Term of Employment

GFI is entitled to summary judgment on Santana's breach of the term of his employment under the Agreement.  Under New York law, an action for breach requires proof of "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."  First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998).  There is no dispute with regard to three of the four factors.  A contract was formed between the parties, and that contract called for Santana to "provide full-time exclusive services to GFI as a broker" through October 15, 2007.  Santana did not perform his obligation under the contract because he left GFI in May 2006.  GFI searched for but was unable to find a replacement for Santana, a fact that caused damages because other brokers were forced to cover his customers, adversely affecting their ability to service their customers.  (Brown Aff. ¶¶ 10, 13.)

The only dispute is with regard to the second element, whether GFI itself performed, or whether its non-performance freed Santana of his contractual obligations. Santana contends that he decided to leave GFI only after he learned that GFI plotted to steal his customers away from him in favor of other GFI brokers, reducing the compensation he earned. (Santana Opp'n 21.) Santana argues that this plot constitutes an anticipatory breach of GFI's "obligation of good faith and fair dealing." The obligation of good faith and fair dealing, implied in all contracts under New York law, "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002). A party commits an anticipatory breach when it "manifests an intent not to perform, either by words or by deeds." Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 587 (2d Cir. 2005). Such intent is made manifest only by "definite and final communication of the intention to forego performance." Rachmani Corp. v. 9 East 96th Street Apartment Corp., 629 N.Y.S.2d 382, 385 (1st Dep't 1995). For a breach to excuse a party from further performance, it must be "material," meaning that the breach goes "to the root or essence of the agreement" and "defeats the object of the parties in entering into the contract." New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 117 (2d Cir. 2006). Thus, for GFI's actions to excuse Santana's non-performance, GFI must have made a "definite and final communication" of its intent to "destroy or injure" Santana's ability to "receive the fruits" of some essential aspect of the Agreement.

Santana has not raised a genuine issue as to whether GFI committed an anticipatory breach. Santana provides evidence that in 2005 GFI contemplated opening an office in Brazil

(see Carty Aff. in Opp'n Ex. R at 15-16), that Santana expressed enthusiasm about the prospect of re-locating to Brazil (Carty Aff. in Opp'n Ex. E ¶ 14), but that GFI management had "reservations" about assigning Santana to Brazil (Carty Aff. in Opp'n Ex. R at 76-77). And Santana contends that in late 2005 and April 2006, GFI asked him to travel to Brazil to introduce some of his brokerage contacts there to other GFI employees. (Carty Aff. in Opp'n Ex. E ¶ 17.) This is hardly evidence of a plot to steal Santana's customers.

The only direct "evidence" of such a plot is Santana's assertion that he was told by a co-worker named Peter Allen that unnamed others at GFI had told Allen that Santana's trips to Brazil were intended to introduce other GFI employees to Santana's contacts "so that those employees could act on GFI's behalf in Brazil, not [Santana]." (Carty Aff. in Opp'n Ex. E ¶¶ 18-19.) Allen's statements, however, are hearsay that in turn relate hearsay from anonymous others, and for good reason they are not properly considered on a motion for summary judgment. See Fed. R. Civ. P. 56(e)(1) (affidavits must set forth "facts that would be admissible in evidence"); Fed. R. Evid. 801(c) (hearsay is an out-of-court statement offered "to prove the truth of the matter asserted"); id. 802 (hearsay is not admissible evidence).

In any event, Allen's statement does not constitute an anticipatory breach because it is not a "definite and final" communication of GFI's intentions. Allen's relaying to Santana what he heard were the intentions of others is, at most, an expression of a possible course of action by GFI, raising doubts about the company's willingness to perform its obligations under the Agreement. However, the "[m]ere expression of doubt as to the willingness or ability to perform does not constitute a repudiation." Anchor Sav. Bank, FSB v. Peerless Federal Sav. & Loan Ass'n, No. CV-89-1154, 1990 WL 34686, at *3 (E.D.N.Y. Mar. 20, 1990), quoting Restatement

(Second) of Contracts § 250 cmt. b (1981). Accordingly, even putting aside that Allen's statements are inadmissible hearsay, they do not evidence an anticipatory breach by GFI.

Moreover, even the unambiguous communication by GFI of a decision to transfer some of Santana's business to other GFI employees would not necessarily be an anticipatory breach of GFI's obligation of good faith and fair dealing. To breach that duty, the alleged plot would need to "destroy or injure" Santana's ability to "receive the fruits" of an essential aspect of the Agreement. But the Agreement does not promise Santana a particular book of business, a particular product focus, or a particular geographic focus. The Agreement does not preclude GFI from reorganizing how it divides territories and product lines among its brokers. To be sure, GFI could not deny Santana a reasonable opportunity to generate revenue and earn commissions. But Santana has offered few details about the alleged plans to transfer his Brazilian business to other employees, making it impossible to determine how much Santana stood to lose, and whether GFI's alleged plan would have given Santana other opportunities in other product lines or geographic markets.

Finally, the record that may be properly considered on summary judgment does not even support Santana's claim that he quit because he subjectively believed that GFI was "trying to steal [his] client contacts." Santana first made this assertion in a December 2007 affidavit, filed in response to GFI's motion. (See Carty Aff. in Opp'n Ex. E.) When asked during an earlier deposition why he quit GFI, Santana mentioned nothing about believing that GFI was stealing his clients. Rather, he stated that he left because of a long-held and "sincere interest of going to Brazil, working in Brazil, physically in Brazil, in Sao Paolo." (Carnevale Reply Decl. Ex. 1 at 146-47.) Santana's later attestation that he quit because he believed GFI was going to deny him

the fruits of the Agreement may not be considered because a party "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony." Bickerstaff v. Vassar College, 196 F.3d 435, 455 (2d Cir. 1999).

Santana signed an agreement obligating him to work for GFI until October 2007 and then he did not fulfill that obligation. Santana's vague conjecture about a plot to steal his business would not permit a reasonable jury to conclude that GFI committed an anticipatory breach of its obligations that would excuse Santana's breach of the Agreement. GFI is therefore entitled to summary judgment that Santana is liable for breach of contract.

## III.     Non-Solicitation Clause

GFI is not entitled to summary judgment, however, on its claim that Santana breached his obligations under the Non-Solicitation Clause. The Non-Solicitation Clause prevents Santana from soliciting any business that is "in competition with the type of services" Santana performed while at GFI with any "GFI Customers" Santana serviced while at GFI. (Brown Aff. Ex. A ¶ 5(E)(i).) GFI argues that Santana has breached this clause because he has brokered NDF transactions on behalf of Tradition Brazil for a number of the financial institutions that Santana serviced while at GFI. (Pl. Mem. 13.) Genuine issues of fact preclude summary judgment on this claim.

First, it is unclear whether brokering NDFs is a service "in competition with" the brokering of options that Santana performed while at GFI. The parties agree that NDFs and options are both "means of trading emerging markets currencies." (Pl. R. 56.1 Statement ¶ 63.) But the record also includes evidence that the products serve different roles, insofar as NDFs are

used as to hedge trades in options. (Carnevale Decl. Ex. 12 at 33.) Because the evidence of the two products' competitiveness is inconclusive, the issue must be left for resolution at trial.

Second, the term "GFI Customers" is ambiguous. GFI claims that it refers to the financial institutions Santana worked with while at GFI, and that Santana's solicitation of individuals at those financial institutions breached the Non-Solicitation Clause. By contrast, Santana claims that the term refers only to the individual traders he worked with while at GFI, and that he did not breach because the traders he solicited at Tradition Brazil were different from those he had worked with while at GFI (see Carty Aff. in Opp'n Ex. A at 158-61).

A contract is ambiguous where its terms "suggest more than one meaning" when viewed objectively in the context of the entire agreement. Scholastic, Inc. v. Harris, 259 F.3d 73, 82 (2d Cir. 2001). The meaning of ambiguous terms present questions of fact for the factfinder. Id. Here, the Agreement does not itself define "GFI Customer," except to say that it encompasses "any customer to GFI or to any Related Entity." (Brown Aff. Ex. A ¶ 5(A)(i).) The Agreement makes reference to the term twice outside of the Non-Solicitation Clause, once to indicate that Santana agrees not to disclose confidential information he learns regarding GFI Customers (id.), and again to indicate that Santana assigns rights to any relationships with GFI Customers to GFI during the term of his employment (id. ¶ 5(c)). All three of these references make sense whether "GFI Customers" is understood to mean the individual traders or the financial institutions for which they work. There are no other indications in the Agreement as to what the term means.

Nor does the commercial context clearly point in one direction or the other. It is certainly plausible for GFI to maintain that its customers, in the ordinary sense of the word, are the financial institutions who enter their transactions with GFI brokers, and not the individual

traders at those institutions who act on their behalf.  (See Pl. Reply 5-6.)  Santana maintains,

however, that such an interpretation would sweep too broadly, because in commercial reality, the

far-flung interests of such institutions are managed in different markets by different individuals,

often even working in different divisions, and in consequence the "customers" of interest in

drafting and interpreting the Non-Solicitation Clause must be the specific traders serviced by

Santana.  (See Def. Opp'n 13-15.)[1]  It is for a jury to sort out these conflicting views of the

business context of the Agreement.  Accordingly, the determination of the meaning of "GFI

Customers" must be left for the factfinder.

## IV.    Non-Competition Clause

Nor is GFI entitled to summary judgment on Santana's alleged breach of the Non-

Competition Clause.  The Non-Competition Clause prevents Santana from having "any interest

in or association with" any competitive "brokerage business," anywhere "within 50 miles" of

GFI's New York office.  Such "interest" or "association" includes being a "shareholder, director,

officer, employee, partner, proprietor, joint venturer, consultant or otherwise."

---

[1] Santana cites a case from this District for the proposition that "[i]n the inter-dealer brokerage business, the institutions are not the 'customers'; the individual traders at those institutions are the customers." (Def. Opp'n 14, citing Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 473 n.2 (S.D.N.Y. 2001).)  This appeal to authority is not persuasive.  While Natsource did say that the "industry definition of 'customers' . . . refers not to the entities themselves, but the traders who work for them," 151 F. Supp. 2d at 473 n.2," it did so in the context of the enforceability of a non-compete, not the interpretation of a contract term.  Furthermore, there is nothing in Natsource's brief footnote, which cites no legal authority, to suggest that the court's statement was anything more than a factual finding based on the specific record in that case.

The undisputed evidence establishes that Santana has an "association" with Tradition NA, which is a competitor to GFI located within fifty miles of GFI's New York office.[2] To "associate" with someone or something means to "combine for a common purpose, to join or form an association." Oxford English Dictionary (2d ed. 1989). Under the Non-Competition Clause, "association" is a broad concept, including, among other things, being a "shareholder, director, officer, employee, partner, proprietor, joint venturer, [or] consultant." (Brown Aff. Ex. A ¶ 5(E)(ii).) Whether the relationship is formalized is not necessarily decisive. So for example, in JA Apparel Corp. v. Abboud, No. 07 Civ. 7787, 2008 WL 2329533 (S.D.N.Y. Jun. 5, 2008), the court found that the defendant had violated the terms of an agreement prohibiting "association" with competitors by having meetings and engaging in negotiations regarding a business relationship with a competitor, even though no final agreement was reached and no substantive operations had commenced. Id. at *29-30.

Here there is clear, unrefuted evidence that Santana has associated with Tradition NA, even though he does not have a formal contractual relationship with that entity. Santana is formally employed as a consultant for Tradition Brazil, but the sole function of Tradition Brazil,

---

[2] Santana argues that "within 50 miles" describes "the geographic area in which Santana may not compete with GFI," rather than the "geographic location of the competitive business" with which Santana is prohibited from associating. (Santana Opp'n 6-7.) This is not a reasonable construction of the clause. The clause does not mention Santana's home or place of work, so "within 50 miles" could not be said to modify either of those places. The phrase could be understood, syntactically at least, to modify "having an interest in or association with." But this does not make sense substantively, since an "interest or association" does not exist in a particular location, but is instead an abstract legal relationship. For example, a "shareholder" interest is a relationship between a shareholder and a corporation, and it makes no sense to say that such a relationship is or is not "within 50 miles" of GFI's New York office. Given these difficulties, the only reasonable interpretation of the Non-Competition Clause is that "within 50 miles" modifies "brokerage business."

which is owned by Tradition NA, is to "maintain relationships with customers and institutions in Brazil" on behalf of Tradition NA. (Carnevale Decl. Ex. 4 at 32-33.) Those working for Tradition Brazil, like Santana, are effectively working for Tradition NA. Executives at Tradition NA make key operational decisions for Tradition Brazil, such as how customer accounts are allocated between brokers in New York and brokers in Brazil. (Id. 132.) When Santana or other brokers in Brazil facilitate transactions, their customers pay their commissions to Tradition NA, not to Tradition Brazil. (Id. 22-23.) In turn, Tradition NA is responsible for paying Santana's and the other Tradition Brazil brokers' salaries (id. 103-06), and Tradition NA is responsible for reimbursing their expenses (id. 126-27.) Tradition NA is even responsible for paying for Tradition Brazil's overhead expenses on an ongoing basis. (Id. 104-106.) While Santana may not be a formal employee of Tradition NA, his regular and significant relationship with Tradition NA establishes that he has joined with Tradition NA for a common purpose.[3] Thus, Santana has formed an "association" with Tradition NA.[4]

---

[3] Santana weakly attempts to create the appearance of genuine issues of fact by contending in his brief that the above facts are disputed. However, this contention is unsupported by the record. For example, Santana contends in his brief that his compensation is not paid by Tradition NA, and instead is "controlled and paid solely by Tradition Brazil," citing the deposition testimony of Tradition Brazil CEO Elias for support. (Santana Opp'n 11-12.) In the very pages cited, however, Elias testifies just the opposite: "I receive money from Tradition [NA] to pay [Santana's] salary and . . . any other broker that . . . I hire." (Carty Aff. in Opp'n Ex. I at 103.) Santana's other asserted factual disputes regarding his associations with Tradition NA are similarly baseless.

[4] This conclusion does not disregard any corporate distinction between Tradition NA and Tradition Brazil, or require "piercing the corporate veil." The Court does not, and need not, make any finding that Tradition NA and Tradition Brazil constitute a single entity, that Santana's employment with Tradition Brazil is a sham, or that Santana is in actuality employed by Tradition NA. Rather, the question is simply whether Santana has entered an "association" with Tradition NA, within the very broad meaning of that term as used in the Agreement. Generating trading commissions for a company that directs one's work, pays one's salary, and reimburses

14

While Santana has an "association" with a competitor of GFI's, it is not clear on the present record that this association violates an enforceable construction of the Non-Competition Clause. The enforceability of covenants not to compete is "rigorously examined" because of "the general public policy favoring robust and uninhibited competition" and the "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood." American Institute of Chemical Engineers v. Reber-Friel Co., 682 F.2d 382, 387 (2d Cir. 1982). To be enforceable, covenants must be "reasonable" in terms of both time and geographic area, and they must be "necessary" to protect the legitimate interests of an employer against unfair competition. Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69-70 (2d Cir. 1999).

The Non-Competition Clause is reasonable as to time and place. Santana does not dispute that the four-month time restriction is reasonable. He does challenge the geographic limitation, asserting that it is tantamount to prohibiting him from "acting as a broker for any inter-dealer broker, or any affiliates or subsidiaries, whether he is physically located in New York or anywhere else in the world." (Santana Opp'n 8.) It is not at all clear that a worldwide prohibition would be unreasonable. Courts have been willing to enforce very broad geographic restrictions on employees where the "nature of the business requires that the restriction be unlimited in geographic scope," so long as the duration of those restrictions was short. Natsource LLC v. Paribello, 151 F. Supp. 2d 465, 471-72 (S.D.N.Y. 2001). With advances in telecommunications, businesses increasingly compete in markets that are national or global in scale, even as those same technologies make it possible for their workers to "telecommute" to their jobs from anywhere in the world. Thus, in Natsource, the court enforced a three-month

---

one's expenses indisputably forms an "association" with that company.

nationwide prohibition on competition because "the inter-dealer broker business . . . is done over the phone lines and [the employee] could conduct his business from anywhere in the world where there is a telephone." Id. at 471. In such situations, any "geographic restriction on the covenants would render them nullities." Id. See also Maltby v. Harlow Meyer Savage, Inc., 633 N.Y.S.2d 926, 930 (Sup. Ct. of N.Y. County 1995), aff'd 637 N.Y.S.2d 110 (1st Dep't 1996) (finding reasonable six-month ban on competitive employment within the New York Metropolitan Area, the Los Angeles greater Metropolitan Area, the greater Toronto Metropolitan area, the greater London Metropolitan Area, and Continental Europe).

But the Court need not decide whether a four-month worldwide ban would be reasonable because Santana has not established that the Non-Competition Clause does, in fact, amount to a worldwide ban. On its face, the Non-Competition Clause prevents an "association" only with those competitors located within 50 miles of GFI's offices in New York. Santana's contention that this amounts to a worldwide ban is based on the fact that all of GFI's competitors have offices in New York City. (Santana Opp'n 8.) But working at the office of a company that has another office in New York does not necessarily require an association with that office, and Santana offers no evidence that it does. His own "association" with Tradition NA arises not from the fact that Tradition Brazil is owned or otherwise affiliated with Tradition NA, but rather from the fact that Tradition NA paid for, directed, and was the sole beneficiary of Santana's work for Tradition Brazil.

That said, the covenant is broader than is "necessary" to protect GFI's legitimate interests in avoiding unfair competition. Two legitimate employer interests can justify a non-competition obligation: protecting against disclosure of an employer's "trade secrets" or other "confidential

16

information" and preventing loss to a competitor of an employee whose services are "special or unique." Ticor, 173 F.3d at 70. There is no allegation that the Non-Competition Clause is necessary to protect trade secrets or other confidential information. Rather, GFI alleges that the clause is necessary because of the "unique" services Santana provided to GFI.

A number of courts have held that the development of personal relationships with an employer's customers can make a broker or sales agent "unique." For example, in Natsource, the court enforced a covenant not to compete against a broker of energy-related commodities based on the "special relationships" the broker had developed with his former employer's customers, relationships that had been "cultivated" using the employer's resources. 151 F. Supp. 2d at 474. Similarly, in Ticor Title Insurance Co. v. Cohen, No. 98 Civ. 4001, 1998 WL 355420 (S.D.N.Y. Jul. 2, 1998), aff'd, 173 F.3d 63, the court held that a sales executive performed "unique" services based on the "substantial sums" the employer had spent "to enable its sales staff to develop the type of relationships with clients that would generate substantial business." Id. at *4. See also Euro Brokers Capital Markets, Inc. v. Flinn, No. 93 Civ. 3785, 1993 WL 213026, at *2 (S.D.N.Y. Jun. 16, 1993); GFI Brokers LLC v. Giardina, No. 600927-2007 (Sup. Ct. N.Y. County Apr. 20, 2007) (Brown Aff. Ex. B); Maltby, 633 N.Y.S.2d at 930.

However, these decisions relied not just on the existence of "special relationships," but on the fact that the broker had the opportunity to exploit those special relationships for the benefit of his new employer, the competitor. See Natsource, 151 F. Supp. 2d at 474 (To allow the broker "immediately to take his services and client relationships to a direct competitor would be a great detriment" to his former employer.); Ticor, 1998 WL 355420 at *4 ("It would be unfair to allow a competitor to appropriate Ticor's investment by simply hiring away its

17

employees."); <u>Maltby</u>, 633 N.Y.S.2d at 930 (Brokers had "developed unique relationships with their customers and their employment by [competitor] would give it an unfair competitive advantage over [former employer].").

As the Second Circuit concluded in affirming the district court in <u>Ticor</u>, an employer has a "sufficient interest" to enforce a restrictive covenant against a broker or sales agent where "the employee's relationship with the customers is such that there is a substantial risk that the employee may be able to divert all or part of the business" to a competitor. 173 F.3d at 72. More generally, the New York Court of Appeals has determined that non-competes provisions are "legitimate" to the extent that they "prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment." <u>BDO Seidman v. Hirshberg</u>, 93 N.Y.2d 382, 391 (1999). Where the terms of a non-compete provision are "unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or . . . competitive unfairness," the provision "does no more than baldly restrain competition," and it "is too broad to be enforced as written." <u>Columbia Ribbon & Carbon Mfg. Co., Inc. v. A-1-A Corp.</u>, 42 N.Y.2d 496, 499 (1977).

Here, the Non-Competition Clause sweeps too broadly to be enforced as written. It purports to prevent Santana from associating with a competitor regardless of the nature of that association. The clause does not limit itself to situations where Santana would have an opportunity to exploit the "information and relationships" gained from his work at GFI. Thus, it purports to prevent Santana from working for a competitor even in situations where his employment poses no risk – let alone a "substantial" one – that GFI would lose customers to that new employer. In such a circumstance, Santana's new employer would gain no unfair

competitive advantage over GFI, and the prohibition would therefore not be "necessary" to the protection of GFI's legitimate interests. "[I]t is not reasonable for a man to be excluded from a profession . . . when he does not compete with his former employer by practicing it." Karpinski v. Ingrasci, 28 N.Y.2d 45, 51 (1971). Accordingly, the Non-Competition Clause is impermissibly broad.

However, the Non-Competition Clause may be saved with a narrowing construction. New York law permits courts to "sever and grant partial enforcement for an overbroad employee restrictive covenant." BDO Seidman, 93 N.Y.2d at 394. In narrowing overbroad covenants, a court should take account of the "legitimate . . . fear that employers will use their superior bargaining position to impose unreasonable anti-competitive restrictions, uninhibited by the risk that a court will void the entire agreement, leaving the employee free of any restraint." Id. But where the non-compete is not the product of "overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct," but is instead a "good faith" effort "to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement may be justified." Id. Here, there is nothing to suggest that the Non-Competition Clause is the product of overreaching or coercion. The situations in which the clause would be overbroad are not common or obvious. The clause is overbroad only as applied to employees who go to work for a competitor in a non-competitive capacity. A drafter might reasonably fail to consider this atypical case. While the relative rarity of the situation does not excuse the overbreadth of the Non-Competition Clause, it also does not suggest that the clause was anything but a "good faith" effort to protect a legitimate business interest. Accordingly, the Non-Competition Clause should be read narrowly to prohibit only associations by Santana that

threaten GFI's legitimate interests against unfair competition from Santana's new employer.

So narrowed, there are genuine issues as to whether Santana has breached the Non-Competition Clause. Santana now brokers NDFs, whereas before he brokered currency options. Santana contends that "most" of the options traders he had been serving while at GFI did not "cross[ ]over" to deal in NDFs. (Carty Aff. in Opp'n Ex. A at 160.) Consequently, his interactions with such options traders would not have given him relationships with traders who would be potential NDF customers for Tradition Brazil. Santana testified that his work at GFI had made him only "somewhat" aware even of who was involved in NDF trading. (Id.) Most importantly, Santana contends that the individual traders he has dealt with while at Tradition Brazil "have all been different individuals from the ones . . . I had spoken to . . . while I was at GFI." (Id. 15.) When he joined Tradition Brazil, Santana says he relied on the relationships he had developed in the NDF market during his employment at a different company six years ago, prior to joining GFI. (Id. 159.) Based on this testimony, a reasonable jury could conclude that Santana has not breached the Non-Competition Clause because his association with Tradition NA does not threaten GFI's legitimate interests against unfair competition.

GFI counters with evidence that Santana in fact had developed relationships with NDF traders while employed at GFI that would be useful to his work for Tradition Brazil. An executive at GFI attests that Santana "was put in charge of organizing GFI's major business development events for customers of all the desks in GFI's emerging markets area, not just the emerging markets options desk" (Brown Aff. ¶ 7), and Santana concedes that with regard to at least one financial institution he "would entertain the whole bank," including both options traders and NDF traders (Carnevale Decl. Ex. 3 at 20-21). Moreover, GFI disputes that there

was little "crossover" between options and NDF trading, offering testimony that "a trader who trades options can hedge themselves using NDF[s], and to my knowledge all of them do." (Carnevale Decl. Ex. 12 at 33.) While this evidence may persuade the factfinder at trial, at this stage of the proceeding it merely establishes that there is a dispute regarding the extent to which Santana developed relationships with NDF traders while working at GFI, and therefore, the extent to which his move to Tradition Brazil threatened GFI's protectable interests. This conflicting evidence presents genuine issues of fact for trial.

## V. Liquidated Damages Provision

### A. Exclusive Remedy

Both GFI and Santana move for summary judgment regarding the validity of the Agreement's liquidated damages provision, which provides an agreed-upon measure of damages for Santana's alleged breach of the Non-Solicitation and Non-Competition Clauses. The first issue is whether the provision is invalid because it is not the "exclusive remedy" set forth in the Agreement. A liquidated damages provision provides an agreement's "exclusive remedy" in the sense that such a provision "precludes any recovery of actual damages." Federal Realty Ltd. Partnership v. Choices Women's Medical Center, Inc., 735 N.Y.S.2d 159, 161 (2d Dep't 2001). This ensures that liquidated damages are not used as a penalty on top of actual damages. It also ensures that parties do not have an option, post-breach, to choose between liquidated or actual damages depending on which is greater, thus defeating the certainty that is the point of liquidated damages provisions. "[W]hen the parties by their contract . . . lay down a rule to admeasure the damages . . . , the remedy thus provided must be exclusively followed." X.L.O. Concrete Corp. v. John T. Brady and Co., 482 N.Y.S.2d 476, 479 (1st Dep't 1984) (denying plaintiff right to

choose to recover actual instead of liquidated damages).

The liquidated damages provision here states that liquidated damages are payable "in addition to all other obligations of [Santana] to GFI and to other remedies available to GFI," and that such damages "shall not be deemed to be exclusive of any other remedies available to GFI, by judicial or arbitral proceedings or otherwise, including to enforce the performance or observation of the covenants and agreements contained in this Agreement."  (Brown Aff. Ex. A. ¶ 5(F)(ii).)  While the provision reserves certain rights with respect to other remedies, it does not run afoul of the "exclusive remedy" requirement.  The key phrase is "other remedies available." The provision does not provide for actual damages in addition to liquidated damages, because it only reserves rights to additional remedies that are "available."  To the extent that New York law precludes the availability of actual damages in a contract providing for liquidated damages, they are not "other remedies available."

This means that GFI may not recover actual damages for breaches of the Non-Solicitation and Non-Competition Clauses, because the liquidated damages provision already provides recovery for such breaches.  But the liquidated damages provision does reserve GFI's recourse to other remedies for breaches of other parts of the Agreement not covered by the provision, such as Santana's breach of the term of employment.  It also reserves GFI's right to seek specific performance, which "the presence of a liquidated damages clause does not bar," Bradford v. New York Times Co., 501 F.2d 51, 56 n.2. (2d Cir. 1974).  The fact that the Agreement reserves other "available" remedies does not invalidate an otherwise valid liquidated damages provision.[5]

---

[5] United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34 (2d Cir. 2004), upon which Santana chiefly relies, is not to the contrary.  The court in that case did hold that "[u]nder no circumstances . . . will liquidated damages be allowed where . . . the contract

22

B.     Reasonableness

The next issue is whether the liquidated damages provision is invalid because it is

unreasonable.  A liquidated damages provision is reasonable where: (1) actual damages are

"difficult to determine," and (2) the sum stipulated is not "plainly disproportionate" to the

possible loss.  Braspetro, 369 F.3d at 70.  Both prongs are evaluated as of the time the parties

entered into the contract, not as of the time of the breach.  DAR & Associates, Inc. v. Uniforce

Services, Inc., 37 F. Supp. 2d 192, 200 (E.D.N.Y. 1999).  Perfection is not the benchmark of a

valid liquidated damages provision.  "The appropriate analysis is not whether a better

quantification of damages could have been drafted by the contracting parties, but whether the

amount of liquidated damages actually inserted in the contract is reasonable."  United Air Lines,

Inc. v. Austin Travel Corp., 867 F.2d 737, 740 (2d Cir. 1989).  The point is to prevent "the

imposition of penalties or forfeitures" whose "purpose is not to provide fair compensation" but

rather to "secure performance" through the threat of disproportionate damages.  J.R. Stevenson

Corp. v. Westchester County, 493 N.Y.S.2d 819, 822-23 (2d Dep't 1985).  Whether a provision

is reasonable is a question of law, with "due consideration for the nature of the contract and the

---

provides for the full recovery of actual damages."  Id. at 71.  But the relevant circumstances of
that case – involving an unusual intersection of Brazilian and New York law – are nothing like
those here.  The Braspetro court considered a bond, governed by New York law, that provided
for liquidated damages only if such damages were provided for in a set of related contracts,
which were governed by Brazilian law.  Id. at 70.  These related contracts allowed for recovery
of a delay-related "penalty" in addition to actual damages.  Id.  The court recognized that the
contracts' "penalty" provision was valid under Brazilian law, meaning that the parties to those
contracts were entitled to "full recovery of actual damages" in addition to the "penalty."  Id. at
71-72.  This circumstance meant that the "penalty" could not be considered a liquidated damages
provision under New York law, because it was available on top of the actual damages.  Id. at 72-
73.  Accordingly, the court concluded that the bond did not provide for liquidated damages.  Id.
By contrast, the Agreement here does not – and, under New York law, cannot – provide for full
recovery of actual damages in addition to liquidated damages.

attendant circumstances." Id. at 823.

Neither Santana nor the defendants are entitled to summary judgment on this issue. The liquidated damages provision does satisfy the first requirement that actual damages be "difficult to determine." This result is dictated by BDO Seidman, in which the New York Court of Appeals considered a situation materially similar to the one here. An agreement between BDO, an accounting firm, and an employee prohibited that employee from providing accounting services to any of BDO's clients for eighteen months following the termination of his employment. 93 N.Y.2d at 387. In the event that he did, the agreement provided that the employee pay BDO 150% of the fees that BDO had earned from such clients in the last fiscal year of the client's patronage. Id. The Court of Appeals found that the liquidated damages provision satisfied the first requirement because the actual damages from violating the restriction would have been "difficult to ascertain." Id. at 396. The difficulty was that the precise value of a client to BDO, and hence, the actual damage suffered from losing that client, is a function of future, unknowable events. "Because of the inability to project with any degree of certainty how long a given client would have remained with BDO if defendant had not made himself available as an alternative source of accounting services, BDO's actual lost profits from defendant's breach would be impossible to determine with any precision." Id.

The same is true here. While defendants are correct that actual damages are simply the difference in lost revenues minus the difference in costs savings (Santana Mem. 11-12), this amount, simple to conceptualize, is difficult to calculate. Assume that Santana's decision to work for Tradition Brazil results in a loss to GFI of some of his customers and that GFI replaces Santana with another broker charged with replacing the lost business. The difference in GFI's

costs is simply the difference between what GFI paid Santana and what it pays the new broker. GFI's lost revenues, however, are the difference between what Santana's customers would have generated in the absence of his breach and what his replacement is able to generate until he fully replaces Santana's book of business. Calculating this requires estimates of: (a) the number of lost customers that can be attributed to Santana's breach; (b) the amount of time it would take the replacement broker to replace the lost business; (c) the revenues the lost customers would have generated for GFI during that time in the absence of a breach; and (d) the revenues that the replacement broker would be able to generate during that time. These calculations are difficult for the same reason as those in BDO Seidman: they depend on unknowable future events.

While the first requirement for liquidated damages is met, there remain genuine issues with regard to the second, whether the liquidated damages are "plainly disproportionate" to actual damages. In the event of a breach, the liquidated damages provision directs that Santana pay the larger of: (a) the average monthly revenues generated by Santana for GFI over the previous twelve months times the number of months remaining on the Agreement plus the four month non-competition time period; or (b) the revenues generated by Santana for his new employer over the same period. (See Brown Aff. Ex. B ¶ 5(F)(ii).) There is at least a rough correlation between the liquidated damages provision and expected actual damages. The liquidated damages are a function either of the revenues Santana would have generated for GFI prior to departure or of the revenues he would generate for a competitor following a departure. Both are measures of the business GFI stood to lose in the event of breach, the first based on Santana's customers at GFI, some percentage of whom the parties might reasonably have expected Santana would take with him to his new employer, and the second based on his

customers at the new employer, some percentage of whom the parties might reasonably have expected would have come with Santana from GFI.  While a correlation with actual damages does not necessarily make a liquidated damages provision a reasonable approximation, it is a "virtue" over a formula that instead sets a fixed sum or a minimum damages award.  DAR & Associates, 37 F. Supp. 2d at 202.

That said, defendants challenge three assumptions of the liquidated damages provision. First, they argue that the calculation is unreasonable because it does not account for the compensation and benefit costs GFI saves following Santana's departure.  This is not persuasive. GFI only saves money in compensation and benefits if it does not hire a replacement for Santana. Defendants have not offered evidence that it would be unreasonable to expect that GFI would hire a replacement for Santana or that the compensation and benefits paid to a replacement would be less than Santana's.  At a minimum, issues of fact exist about what cost savings could be realized by GFI as a result of Santana's defection.

Second, defendants argue that the calculation is unreasonable because it assumes that GFI's losses will persist for the time remaining under the Agreement plus the four-month non-compete period rather than simply for four months.  Defendants' argument is based on a stipulation in the Agreement that the four-month non-compete period is the amount of time necessary "for other employees to develop relationships with GFI Customers with whom [Santana] had worked."  (Brown Aff. Ex. A ¶ 5(E)(iii).)  Defendants' contention that the stipulation is relevant to the calculation of actual damages is without merit.  The stipulation sets forth the amount of time the parties agreed would be needed before Santana's work for a competitor is no longer a threat to GFI's legitimate interests.  In the event that Santana breaches

the Non-Competition Clause, the damages could last longer than the period of time it would have taken GFI to solidify its relationships with Santana's customers in the absence of a breach. There is no reason to think that the two periods – one defining a breach and the other approximating the damages from a breach – would be identical. In any event, the determination of reasonableness depends on the resolution of factual disputes about what the parties could reasonably have expected as to the duration of damages from a breach of the Non-Competition Clause.

Third, defendants argue that the calculation is unreasonable because it assumes that one-hundred percent of Santana's customers would leave GFI as a result of a breach. Defendants point to evidence that GFI was able to quickly reassign Santana's customers to other brokers with little or no gap in coverage (Carty Aff. Ex. J at 164-66; Carty Aff. Ex. M at 37; Carty Aff. Ex. L at 55-56), and that in the immediate aftermath of Santana's departure, no GFI customers indicated that they planned to decrease or cease doing business with GFI (Carty Aff. Ex. J at 175). But this evidence does not establish that no customers left because of Santana's alleged breach. The premise of the Non-Competition Clause is that Santana gives his new employer an unfair advantage because of the "special relationships" he had developed with them while at GFI. There is no reason to think that GFI's responsiveness in assigning a new broker to Santana's customers would eliminate this unfair advantage. That Santana's customers did not immediately announce their intention to stop doing business with GFI does not establish that they did not ultimately do so, particularly in light of the fact that Santana did not begin work for Tradition Brazil until over two months after he left GFI. It would be premature to conclude that Santana did not win business from these customers on behalf of Tradition NA based on evidence

of the customers' intentions before Santana even began work for Tradition NA.

More fundamentally, the issue is not how many customers GFI actually lost following the purported breach, but rather how many customers it was reasonable to expect, as of the time the Agreement was signed, that GFI would lose following such a breach. Furthermore, it is not enough to show that the customers GFI actually lost is less than the hundred percent assumed by the liquidated damages calculation. The reasonableness of the liquidated damages provision turns on the reasonableness of the estimate taken as a whole, not on the accuracy of any given component of the formula. It is possible that any overestimate of the number of lost customers is counterbalanced by underestimates in other respects. For example, the calculation may underestimate the amount of time it would take a replacement broker to win back the business lost as a result of a breach. If so, any such underestimate might offset any overestimate of the loss of customers, and the liquidated damages provision as a whole might not overestimate actual damages. Finally, it is not enough to show that the liquidated damages provision overestimates actual damages. Rather, any such overestimate must make the provision "plainly disproportionate" to actual damages. Because of deficiencies in the way defendants have conceptualized actual damages from a breach of the Non-Solicitation or Non-Competition Clause, defendants have failed to establish as a matter of law that the liquidated damages provision is "plainly disproportionate."[6]

_____

[6] Santana also argues that the second prong of the liquidated damages provision is an invalid penalty because it acts as a "kicker" on top of the "already inflated calculation" of the first prong. Santana provides no basis for rejecting the second prong not already addressed with respect to the first prong. Nor is there any reason to reject the second prong just because it potentially allows for greater recovery than the first prong. While Howard Johnson International Inc. v. HBS Family, Inc., No. 96 Civ. 7687, 1998 WL 411334 (S.D.N.Y. Jul. 22, 1998), upon which Santana relies, rejected a two-part liquidated damages formula, it did so not because such

On the flip side, GFI has failed to prove that the liquidated damages are *not* "plainly disproportionate" to expected actual damages. GFI addresses none of the above assumptions underlying the liquidated damages calculation. Indeed, GFI also apparently misunderstands the actual damages from a breach of the Non-Solicitation or Non-Competition Clauses, including such items as the "harm to other brokers" forced to "cover Santana's client assignments" and the "unique attributes associated with Santana," such as his "potentially irreplaceable brokering and client development skills." (Pl. Mem. 21.) These harms would result from *any* decision by Santana to stop working for GFI, whether or not he subsequently went to work for a competitor. Since GFI would have suffered such damages whether or not Santana breached the Non-Solicitation and Non-Competition Clauses, they are not damages from a breach of these provisions.

The reasonableness of liquidated damages is a question of law for the Court. However, because the parties have misunderstood the nature of the damages that result from a breach of the Non-Solicitation and Non-Competition Clauses, the record is not sufficiently developed to make a definitive ruling at this time. In <u>BDO Seidman</u>, the Court of Appeals confronted a similar liquidated damages provision that calculated damages based on average historical gross revenues, but declined to rule on the provision's enforceability because of the "sparse proof" as to its reasonableness. 93 N.Y.2d at 397. That guidance is persuasive – if not binding – here, and summary judgment is denied to both GFI and defendants on the issue of the reasonableness of

_____

formulas are inherently suspect, but because the second part of the formula was itself "not proportional to the possible loss." <u>Id</u>. at *7. Since Santana has not shown the second prong of the liquidated damages provision here to be disproportionate to the possible loss, he has not shown it to be invalid penalty.

liquidated damages.[7]

C.    Applicability to Tradition Brazil and Elias

Regardless of the reasonableness of the liquidated damages provision, such damages are not recoverable from defendants Tradition Brazil and Elias, who are accused of tortiously interfering with GFI and Santana's agreement.  GFI's complaint against Tradition Brazil and Elias seeks only damages that "GFI has been caused to suffer," and does not explicitly seek liquidated damages, as GFI's complaint against Santana does.  (Compare Tradition Brazil Compl. ¶ 37 with Santana Compl. ¶ 31.)  Nor could GFI seek such damages.  Under New York law, tort damages are recoverable "only for those injuries that flow directly from, and are the probable and natural consequences of, the wrong alleged."  BD ex rel. Jean Doe v. DeBuono, 193 F.R.D. 117, 139 (S.D.N.Y. 2000).  Liquidated damages do not "flow directly" from the interference with a contract or from its breach.  They are a wholly contractual creation, resulting from an agreement by the parties to the contract to forego calculation of actual damages in favor of "a *liquidation* of the anticipated damages."  J.R. Stevenson Corp., 493 N.Y.S.2d at 823 (emphasis added).  They are thus a replacement for actual damages, not a component or a measure of them.

Liquidated damages "must be the result of an express agreement between the parties," and are not recoverable in tort.  Land Mine Enterprises v. Sylvester Builders, Inc., 74 F. Supp. 2d

---

[7] Santana also argues that unequal bargaining power between the parties favors a finding that the liquidated damages provision is a penalty.  At the time the contract was negotiated, Santana was a valuable and experienced player in the inter-dealer brokerage market.  He also had access to competent counsel, whom he had used in the past for employment-related issues, even if he may not have consulted counsel with respect to this particular agreement.  (See Carty Aff. Ex. F at ¶ 5; Carnevale Decl Ex. 9 at 9-11.)  Under these circumstances, it is difficult to attribute Santana's accession to the liquidated damages provision to a disadvantaged bargaining position.

401, 408 (S.D.N.Y. 1999). GFI's recovery from Tradition Brazil and Elias is limited to those damages that it can prove resulted from their alleged interference with the contract. Neither Tradition Brazil nor Elias have entered into any agreement with GFI authorizing an award of any other type or amount of damages. That GFI and Santana have separately agreed to supplant actual damages arising from a breach of certain provisions with contractually defined liquidated damages is irrelevant to GFI's recovery from Tradition Brazil and Elias for an action in tort.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted with respect to Santana's liability for breaching the term of his employment and denied in all other respects. Defendant Santana's motion for summary judgment is denied in its entirety. The motion for summary judgment by defendants Tradition Brazil and Elias is granted with respect to the application to them of the liquidated damages provision, and it is denied in all other respects.

SO ORDERED.

Dated: New York, New York
August 6, 2008

GERARD E. LYNCH
United States District Judge

31