UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/13/09

GFI BROKERS, LLC,

               Plaintiff,

    -against-

JOHN P. SANTANA,

               Defendant.

06 Civ. 3988 (GEL)

------------------------------------------------------------x

GFI BROKERS, LLC,

               Plaintiff,

    -against-

OFIR ELIAS FILHO, a/k/a OFIR ELIAS,
TRADITION BRASIL CONSULTORIA
EMPRESARIAL, LTDA d/b/a TRADITION
BRASIL,

               Defendants.

**OPINION AND ORDER**

06 Civ. 4611 (GEL)

------------------------------------------------------------x

Lawrence F. Carnevale, Mark R. Zancolli, and
Sandra Bourgasser-Ketterline, Carter Ledyard &
Millburn LLP, New York, NY, for plaintiff.

M. Christine Carty, Seth E. Spitzer, and Daniel J.
Brooks, Schnader Harrison Segal & Lewis LLP,
New York, NY for defendant John P. Santana.

GERARD E. LYNCH, District Judge:

     At issue is the enforceability of the liquidated damages provision in the employment

contract between plaintiff GFI Brokers, LLC ("GFI") and defendant John P. Santana.  Santana

contends that the provision is disproportionate to any reasonably expected damages and as a

result is an unenforceable penalty.  GFI, by contrast, argues that the provision represents an appropriate attempt to approximate anticipated damages and should be upheld.  For the reasons that follow, the Court finds the liquidated damages provision to be enforceable.

## BACKGROUND

This Opinion assumes familiarity with the facts set forth in GFI Brokers, LLC v. Santana, Nos. 06 Civ. 3988, 06 Civ. 4611, 2008 WL 3166972 (S.D.N.Y. Aug. 6, 2008) ("GFI Brokers I"), which addressed the parties' cross-motions for summary judgment.  In that Opinion, the Court concluded that Santana had breached the term of his employment with GFI by resigning before the contract's expiration, but found genuine issues of material fact requiring a trial as to whether Santana had breached either the Non-Solicitation Clause or the Non-Competition Clause (jointly, the "restrictive covenants") in subsequently working for defendant Tradition Brazil.  Id. at *3-11.  The Court also denied summary judgment with respect to the reasonableness of the liquidated damages provision providing damages for a breach of either of the restrictive covenants.  Id. at *15.  Recognizing that the reasonableness of liquidated damages is a question of law for the Court, the Court found that while the provision satisfied the requirement that actual damages would be difficult to determine, the record was insufficiently developed to determine whether the liquidated damages were "plainly disproportionate" to actual damages.  Id.[1]

An evidentiary hearing to find additional facts necessary to determine the reasonableness of the liquidated damages provision was held on January 22, 2009.  At that hearing, Nicolas

---

[1]  Both GFI and Santana moved for reconsideration of the ruling concerning the liquidated damages.  Those motions were denied.  GFI Brokers, LLC v. Santana, Nos. 06 Civ. 3988, 06 Civ. 4611, 2008 WL 3982913 (S.D.N.Y. Aug. 27, 2008) ("GFI Brokers II").

Brown, a current Senior Managing Director for GFI, testified for GFI, and Donald Fewer, who formerly held that position, testified for Santana.  (Brown Aff. ¶ 1; Fewer Aff. ¶¶ 1-4.)

## DISCUSSION

### I.    Legal Standards

A court's evaluation of the reasonableness of a liquidated damages provision must allow parties the freedom to contract while recognizing that the "freedom to contract does not embrace the freedom to punish, even by contract."  Raggitan v. Commodore Int'l Ltd., 739 F. Supp. 167, 169 (S.D.N.Y. 1990).  "While the freedom of parties to structure their agreement is universally acknowledged to be at the heart of the law of contract, the limited enforcement of [liquidated damages] clauses is a judicial check on the freedom of contract based on public policy notions of the courts of equity."  Brecher v. Laikin, 430 F. Supp. 103, 106 (S.D.N.Y. 1977) (internal citation omitted).  A punitive provision which sets damages grossly disproportionate to probable actual loss will be disallowed as against public policy because such a clause does not "provide fair compensation" but rather operates to "secure performance by the compulsion of the very disproportion."  Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc., 41 N.Y.2d 420, 424 (1977).

Earlier cases tended to navigate these competing policies by finding a presumption, in close cases, "to favor the construction which makes the sum payable for breach of a contract a penalty rather than liquidated damages."  E.g., Raggitan, 739 F. Supp. at 169.  The balance has now shifted towards freedom of contract, as "[i]t has become increasingly difficult to justify the peculiar historical distinction between liquidated damages and penalties.  Today the trend favors freedom of contract through the enforcement of stipulated damage provisions so long as they do not clearly disregard the principle of compensation."  3 Farnsworth, Contracts § 12.18 at 303-04

3

(3d ed.), quoted in JMD Holding Corp. v. Cong. Fin. Corp., 4 N.Y.3d 373, 380-81 (2005).

While "[t]he rule [against penalty clauses] hangs on, . . . [it] is chastened by an emerging

presumption against interpreting liquidated damages clauses as penalty clauses." XCO Int'l Inc.

v. Pac. Scientific Co., 369 F.3d 998, 1002-03 (7th Cir. 2004), quoted in JMD Holding Corp., 4

N.Y.3d at 381. Accordingly, a liquidated damages provision is not to be interfered with "absent

some persuasive justification." Bigda v. Fischbach Corp., 849 F. Supp. 895, 902 (S.D.N.Y.

1994). The burden is firmly on the party challenging the provision to provide that justification

by demonstrating that the stipulated damages are, in fact, an unconscionable penalty. See JMD

Holding Corp., 4 N.Y.3d at 380.

Where, as here, actual damages are difficult to determine, "[a] contractual provision

fixing damages in the event of breach will be sustained if the amount liquidated bears a

reasonable proportion to the probable loss." Id. Reasonableness enjoys wide latitude; the

standard against which it is measured is "plain" or "gross" disproportionality. Only where the

"amount fixed is plainly or grossly disproportionate to the probable loss," is the provision

deemed an unenforceable penalty. Id.; accord, U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs.

Co., 369 F.3d 34, 70 (2d Cir. 2004); United Air Lines, Inc. v. Austin Travel Corp., 867 F.2d 737,

740 (2d Cir. 1989).

Because liquidated damages are "in effect, an estimate, made by the parties at the time

they enter into their agreement, of the extent of the injury that would be sustained as a result of a

breach of the agreement," JMD Holding Corp., 4 N.Y.3d at 380, the reasonableness of the

provision must be evaluated as of that time, see e.g., DAR & Assocs., Inc. v. Uniforce Servs.,

Inc., 37 F. Supp. 2d 192, 200 (E.D.N.Y. 1999). A liquidated damages provision will not be

deemed a penalty simply because it is not perfectly calibrated to actual damages. Rather, the

4

provision need only achieve a "reasonable mechanism for estimating the compensation which should be paid to satisfy any loss flowing from the breach." In re Ionosphere Clubs, Inc., 262 B.R. 604, 614 (Bankr. S.D.N.Y. 2001).  As recognized in GFI Brokers I, "[t]he appropriate analysis is not whether a better quantification of damages could have been drafted by the contracting parties, but whether the amount of liquidated damages actually inserted in the contract is reasonable."  2008 WL 3166972 at *12, quoting United Air Lines, 867 F.2d at 740.

Under these guiding principles, and with "due consideration for the nature of the contract and the attendant circumstances" Braspetro, 369 F.3d at 71, it is determined that the liquidated damages provided for in Santana's employment agreement are reasonable and Santana has not satisfied his burden to prove otherwise.

## II.   Use of Santana's Revenue Stream

The centerpiece of the liquidated damages provision is the revenue stream generated by Santana.  Liquidated damages for a breach of either the Non-Competition or Non-Solicitation Clause are calculated, in relevant part, as:

> the product of (x) the monthly average of Santana's Net Revenues[2] for the twelve (12)-month period immediately preceding the termination of [Santana's] employment with GFI . . . , and (y) the number of month's remaining unfulfilled under this Agreement and [the four-month post-termination period] contained in [the Non-Solicitation Clause and the Non-Competition Clause] . . . .

---

[2] "Net Revenues," which form the basis of the calculation, are the gross commissions earned on trades minus any necessary adjustments reflecting problems with the trade. (Hr'g Tr. 106:25-107:13.)  It is, conceptually, an adjusted gross revenue figure, rather than a "net" figure, as it does not encompass all costs associated with the production of that revenue.  (Id.)  For example, it does not reflect the cost of Santana's salary.  (Id. 107:15-18.)

(Brown Aff. Ex. A ¶ 5(F)(ii).)[3]

As an initial matter, it is worth reiterating the Court's observation in GFI Brokers I that the "rough correlation" between liquidated damages and actual damages achieved by tying damages to the historical revenue stream – such that the more productive Santana has been, the greater the damages – is a significant "virtue" over a formula setting a fixed sum or imposing a mandatory minimum amount of damages. 2008 WL 3166972, at *13, quoting DAR & Assocs., 37 F. Supp. 2d at 202. The additional facts adduced since that time confirm that while this formula may not achieve a perfect correlation, it achieves a reasonable one.

Santana, relying on the testimony of Fewer, claims that it was unreasonable to expect that "GFI would lose any clients or significant revenue if Santana left and went to work for a GFI competitor" because clients were not drawn to GFI by the relationship with any individual broker, such as Santana, but rather to the GFI brand as a whole. (Santana Post-Hr'g Mem. 8, citing Fewer Aff. ¶¶ 12-16.)[4] As an initial matter, though the topic of exactly how compensation

---

[3] The liquidated damages clause also provides an alternative measure of damages, to be applied if the result is greater than the sum above, calculated as "the corresponding amount of Net Revenues earned by [Santana] or by [Santana's] new employer as a result of [Santana's] efforts during the same time period as described above." (Brown Aff. Ex. A ¶ 5(F)(ii).) Santana does not renew his unsuccessful attempt from the summary judgment phase to invalidate the liquidated damages provision based on this alternative provision. See GFI Brokers I, 2008 WL 3166972, at *14 n.6. Indeed, quite the contrary, Santana now suggests that the second alternative is more reasonable than the first (hr'g Tr. 135:25-136:4 (favoring using competitor's revenue stream)), and Santana's witness suggested that the second alternative will ordinarily result in lower damages (id. 49:8-22; 66:8-67:8 (testifying that a broker's revenue will typically decline upon joining a competitor and discussing the practice of providing guarantees to shield brokers from this transition risk)). Accordingly, faced with no evidence that the second alternative results in a "grossly disproportionate" penalty, this Opinion will focus exclusively on the validity of the first.

[4] Fewer also claims that it was unreasonable for GFI to expect any significant injury from Santana's departure and subsequent competition because Santana was not a major producer of revenue. (Fewer Aff. ¶ 14.) To the extent this is true, the liquidated damages formula

decisions at GFI are made generated much confusion at the hearing, it is clear that, as a broker at GFI, Santana's compensation was based, to some degree, on the revenues he generated for GFI. (Hr'g Tr. 57:21-65:18; 97:15-99:12.) This practice implicitly recognizes that such revenue is in some significant way attributable to Santana's efforts, and supports the idea that revenues are, at the very least, a good starting point for a measure of damages. Further, Fewer's attempt to characterize the client's decision concerning which brokerage to use as largely divorced from the efforts of any individual broker is at odds with the heavy emphasis the industry places on client relationships. (Id. 33:10-35:24.)

Even more critically, Fewer's testimony is internally inconsistent. Fewer asserts that a proper measure of liquidated damages – which must be proportionate to GFI's actual damages – should be based on profits rather than on revenue. (Id. 73:7-17 ("[I]t needs to be, it's not a revenue-based number, because there are costs . . . to generate that. It needs to be a fundamental cost concept.") Fewer agrees, in other words, that a fair measure of liquidated damages would focus on Santana's *net* value to GFI, that is, the revenue Santana generated for GFI, minus the various costs associated with the production of that revenue. This alternative measure, however, assumes that Santana's clients would follow him to a competitor to the same extent as with the revenue-based damages Fewer asserts are unreasonable. While arguably more refined, Fewer's proposed standard is based, like the contract's standard, on the assumption (elsewhere derided by Fewer) that Santana did indeed generate revenue for GFI that would be lost or reduced on his departure and subsequent competition.

---

perfectly accounts for this contingency and amply demonstrates the virtue of this formula over a fixed sum or minimum damages approach.

Nevertheless, the argument that damages should be based on profits rather than on revenue does have some merit as, on first glance, it would appear to more accurately represent the injury anticipated by GFI.  GFI, however, presented persuasive evidence that if the contractual formula overestimates foreseeable injury by excluding costs associated with revenue production, it underestimates foreseeable injury in other respects, rendering the provision, on balance, proportionate.  These additional injuries include, for example, the efforts and expense of finding and training a suitable replacement and the overall loss of liquidity and speed of execution on GFI's emerging markets desk (which Santana serviced at GFI).  (Brown Aff. ¶¶ 18, 20; Hr'g Tr. 28:6-29:11; see also Santana Post-Hr'g Mem. 10.)

Rather than attempting to refute this evidence, Santana argues that it should not count.  Santana characterizes the injury sustained in cultivating a replacement a "post hoc" justification and the remainder impermissible "peripheral" considerations that would occur anytime Santana left GFI, regardless of whether he subsequently competed against it.  (Santana Post-Hr'g Mem. 10, 12.)  The evidence is not so easily dismissed.  First, while it is true that Brown's testimony spoke to the situation it encountered upon Santana's actual departure, which would not have been known ex ante, his testimony also adequately explained the difficulties GFI prospectively anticipated.  (Brown Aff. ¶¶ 17-18.)[5]  Second, although GFI Brokers I implied that "harms [that] would result from any decision by Santana to stop working for GFI whether or not he subsequently went to work for a competitor" were not properly considered damages attributable

---

[5]  Santana's attempt to discredit Brown on this point is unavailing.  Santana attempts to rebut Brown with evidence that "far from being 'tight' the job market was one in which GFI was able to add" over 150 brokers each in 2004 and 2005. (Santana Post-Hr'g Mem. 11-12.) Santana's point fails because it assumes brokers are entirely fungible and ignores Brown's narrower point, that the "market for *qualified brokers with established client relationships* is normally tight." (Brown Aff. ¶ 17 (emphasis added).)

to a breach of the Non-Solicitation or Non-Competition Clauses and could not justify the reasonableness of the provision, 2008 WL 3166972, at *15, further reflection and the additional evidence presented at the hearing has led to a different conclusion, because in this instance, the restrictions largely overlap.

A useful way to conceptualize the situation is to suppose that the Agreement did not independently hold Santana to a term of employment. Suppose, that is, that the only action that would trigger a breach would be a violation of the restrictive covenants. In such a situation, it clearly would not be unreasonable to include what Santana characterizes as "peripheral" damages – damages that would flow to GFI from the mere fact of Santana's resignation from the company, regardless of whether he thereafter competed or solicited – in the computation of competition-related damages. Such damages would be subsumed in the general category of losses attributable to violation of the restrictive covenants, since "competing in violation of the nonsolicitation and/or noncompetition provisions assumes the broker is no longer serving his employment term." (GFI Post-Hr'g Mem. 12.) That the Agreement is not, in fact, limited to the non-competition clauses and does indeed contain a separate term restricting Santana's right to leave GFI during the term of the Agreement does not materially change this result, since the term of agreement is largely concurrent with the period of restraint imposed by the restrictive covenants (save for the additional four-month post-termination non-compete period).

Accordingly, the fact that the formula does not segregate damages accruing from competition and/or solicitation from those which would flow to GFI merely upon Santana's departure does not render the provision unreasonable. While the damages clause would no doubt be more precise if the formula contained a mechanism to accurately segregate the strictly competition related injuries from the non-competition – or "peripheral" – damages so as to be

able to apply each to the appropriate time frame, the formula's failure to engage in this perhaps impossible calculation does not render the provision grossly disproportionate to the reasonably anticipated ex ante losses. This is particularly so given that there has been no showing as to the magnitude of damages flowing from each of these nebulous categories of damages, as would be necessary to determine that the inclusion of peripheral elements during the short period of incongruity between the periods of restraint results in gross disproportion.

Nor has Santana otherwise demonstrated that the use of revenue stream is inappropriate. Although the measure may not be perfect, as GFI readily concedes, it must be remembered that "it is not enough to show that the liquidated damages provision overestimates actual damages. Rather, any such overestimate must make the provision 'plainly disproportionate' to actual damages." GFI Brokers I, 2008 WL 3166972, at *14.

All things considered, Brown's credible testimony is persuasive that the use of Santana's historic revenue stream as a proxy for damages does not result in a figure that is "grossly disproportionate" to what was reasonably expected. Nor do Santana's further challenges to the enforceability of the provision alter this result.

### III.    Failure to Engage in Precise Calculation or Offer Evidence of Historical Losses

Santana makes much of the fact that GFI did not engage in a precise calculation of the damages it expected at the time it executed the contract: "Since they made no estimate, our position is that it couldn't possibly be reasonable." (Hr'g Tr. 131:5-6; see also id. 130:21-131:4.) Likewise, Santana faults GFI for failing to provide evidence of the historical record of the average losses it sustains when a former broker competes against it. (Santana Post-Hr'g Mem. 12.) In doing so, Santana attempts to capitalize on GFI Broker II's statement reiterating that summary judgment on the reasonableness of the liquidated damages provision was not

available to either GFI or Santana because "it is not possible to decide whether the liquidated

damages provision is enforceable without some evidence about what damages were reasonable

to expect from a breach of the Non-Solicitation or Non-Competition Clauses." (See id., quoting

GFI Brokers II, 2008 WL 3982913, at *1 n.1.)

GFI Brokers II, however, did not impose a requirement upon GFI to present any

particular category of evidence, such as evidence of actual damages suffered in comparable past

situations. Although additional evidence in the form Santana desires certainly would have been

probative, the absence of such evidence is not fatal to the liquidated damages clause. Santana

cites no cases suggesting that an employer's exact investigation of actual damages from prior

employee departures is a prerequisite to an enforceable liquidated damages measure. Indeed,

such a requirement would be untenable: were it possible to have the exact accounting Santana

seems to desire, there would likely be no need to resort to liquidated damages at all, for it is

axiomatic that liquidated damages are only available where actual damages are expected to be

difficult to determine. See JMD Holding, 4 N.Y.3d at 380. GFI has now provided sufficient

evidence concerning the underlying factors that bear on its anticipated injuries when a former

broker competes against it, as recounted above. That it did not concoct a unique formula

perfectly tailored to whatever intricacies may arise from the peculiarities of Santana's individual

situation based on empirical calculations of past damages does not demonstrate that the formula

arrived at is grossly unreasonable. Cf. Truck Rent-A-Center, 41 N.Y.2d at 426-27 ("We attach

no significance to the fact that the liquidated damages clause appears on the preprinted form

portion of the agreement.") "To hold otherwise would essentially require contracting parties to

bear the negotiating costs of tailoring liquidated damages differently depending on the various

factors that can affect actual losses. This would largely defeat the central purpose that such

11

provisions serve." DAR & Assocs., 37 F. Supp. 2d at 203.

**IV.     Effect of "Lesser Breach"**

Santana argues that even if the liquidated damages are not disproportionate to the

damages likely to result from direct competition, they are necessarily disproportionate to the

damages likely to result from indirect competition in a different type of currency option than he

was brokering for GFI, thereby rendering the provision an unenforceable penalty.  Specifically,

Santana maintains that "whether a lesser injury is foreseeable or not, a liquidated damages clause

will not be enforced where, as here, a breach of contract posing the likelihood of a lesser injury

would be disproportionally punished by the blanket application of a liquidated damages

provision intended to remedy a substantially more severe breach and resulting injury."  (Santana

Post-Hr'g Mem. 4.)

In so arguing, Santana conflates two distinct, albeit related, concepts: liquidated damages

impermissibly applied to minor covenants within a contract and liquidated damages permissibly

applied to minor breaches of a major covenant.  The New York Court of Appeals long ago

endorsed the principle that

> where a contract contains a number of covenants of different
> degrees of importance and the loss resulting from the breach of
> some of them will be clearly disproportionate to the sum sought to
> be fixed as liquidated damages, especially where the loss in some
> cases is readily ascertainable, the sum so fixed will be treated as a
> penalty.

City of N.Y. v. Brooklyn & Manhattan Ferry Co., 238 N.Y. 52, 53 (1924), quoting Seidlitz v.

Auerbach, 230 N.Y. 167, 173 (1920).  That principle has remained in force ever since.  See, e.g.,

John T. Brady & Co. v. Form-Eze Sys., Inc., 623 F.2d 261, 263 (2d Cir. 1980) ("It is well settled

in New York that a clause in a contract providing for the payment of a fixed amount upon a

12

breach of *any provision* of that contract, no matter how trivial the breach, cannot be sustained as a liquidated damages provision since it does not represent an estimate of prospective actual damages." (emphasis added)); Bigda, 849 F. Supp. at 903 (finding liquidated damages provision that was applicable "if any unenumerated provision of the Employment Agreement, no matter how trivial, was breached" indicative of a penalty); see also JMD Holding Corp., 4 N.Y.3d at 383 (quoting Seidlitz).

Seidlitz and subsequent cases have justified this result with the notion that "the strength of a chain is that of its weakest link." 230 N.Y. at 173. The problem for Santana is that he has not identified a weak link but rather attempts to dissect the individual links that are the Non-Solicitation and Non-Competition Clauses. Contrary to Santana's position, however, is clear that a liquidated damages provision is not unreasonable by simple virtue of the fact that it is capable of providing damages disproportionate to actual damages because in all instances reasonableness must be measured *ex ante*. See, e.g., DAR & Assocs., 37 F. Supp. at 202. So, for example, in Bidga, the court found that a liquidated damages clause was not rendered unreasonable by the fact that it called for a uniform payment of three year's worth of salary and benefits regardless of the time of the breach and, even though at the time of breach, the only four weeks remained in the five-year employment contract. 849 F. Supp at 902-03. The Bigda court reasoned that although application of the liquidated damages would provide a windfall to the employee given what actually transpired, the three year payout on a five year contract was not plainly disproportionate to probable actual loss viewed at the time of execution of the agreement. Id.; see also DAR & Assocs., 37 F. Supp. 2d at 202 (clause not unreasonable for failure to take

13

into account when breach occurs).[6]

As the above cases make clear, the fact that a breach causing minor damage is possible does not render a liquidated damages clause unenforceable; liquidated damages must be measured for reasonableness *in toto*. By that measure, in the absence of evidence that GFI should have anticipated not only that it was possible that Santana would commit what he characterizes as a "lesser" breach, but more importantly that it was *likely* that a breach would take this form and result in significantly lower damages, Santana in effect impermissibly seeks to rely on hindsight.[7]

## V.    Subjective Intent

Santana further argues that the liquidated damages provision is unreasonable because GFI explicitly intended for it to operate as a penalty in an effort to coerce Santana to continue

---

[6] LeRoy v. Sayers, 635 N.Y.S.2d 217 (1st Dep't 1995), relied upon by Santana, is distinguishable. In LeRoy, although the court found the damages to be an unenforceable penalty because "the clause awarded the same exorbitant sum irrespective of the time of the breach and even in the instance where, concededly, the damages flowing from a breach . . . would be negligible," a salient feature in that case was the abject failure to proportion damages to the actual loss. Id. at 222-23. The fixed-sum damages amount of $50,000 bore absolutely no relation whatsoever to the losses that could have been anticipated for a breach of the rental lease.

[7] Along these lines, Santana argues alternatively that the clause – even if not a penalty in its entirety – "should be deemed not to apply to the breach allegedly committed by Santana, consisting of brokering a different product (NDFs) with different traders than those he serviced at GFI" (id. at 5) because it was not within the intention of the parties for the restrictive covenants to apply to this behavior (id. at 4). In doing so, Santana seemingly seeks to rely on Brecher, which involved a unique situation that the court determined the parties had not considered: "partial performance, then a total breach of a lesser divisible obligation, followed by complete performance" of the other divisible obligations. 430 F. Supp. at 107. Although Santana attempts to capitalize on the court's finding that the clause would not apply to the "partial breach" that transpired but which the parties had never envisioned, this result is conceptually akin to the separate covenant idea given the explicit recognition that the breach was of a "divisible obligation." There is thus no basis for a similar result here. It is for the factfinder to determine whether Santana breached either of the restrictive covenants. If he did, the liquidated damages clause will apply, if the Court determines that it is enforceable.

employment with GFI. But such subjective intent is of little probative value in assessing the reasonableness of the provision, for "the prospect of damages in the event of a breach may always be said to encourage parties to comply with their contractual obligations. Liquidated damages are not transformed into a penalty merely because they operate in this way as well, so long as they are not grossly out of scale with foreseeable losses." Bates Adver. USA, Inc. v. 498 Seventh, LLC, 7 N.Y.3d 115, 120 (2006) (rejecting landlord's contention that liquidated damages clause unenforceable where lessee's attorney testified that "the clause was intended to 'incentivize' the landlord, and to provide a 'club over his head to make sure he gets the work done").

In any event, Santana's evidence regarding GFI's allegedly punitive intent is wholly unpersuasive. Santana points to the testimony of his witness, Fewer, who claimed that he participated in GFI executive committee meetings in 2000 during which it was expressly determined that GFI would include a punitive liquidated damages provision in its employment contracts for the primary purpose of imposing a significant financial punishment on brokers, like Santana, who desired to leave. (Fewer Aff. ¶¶ 12-13; Hr'g Tr. 87:13-88:10; 95:13-96:17.) Fewer's testimony, however, is fundamentally unreliable and the Court declines to give it any weight on this issue. Fewer's present assertion directly contradicts his sworn statement in a separate case in 2003 (made as a representative of GFI) – three years after this punitive policy was supposedly put in place – that GFI's liquidated damages provisions were inserted "in order to address the projected loss of revenue GFI would suffer in the event that the [employees] failed to perform their brokerage services through the complete term of their agreements . . . ." (2/6/09

15

Carty Aff. Ex. A ¶ 6.)[8]  Moreover, not only does Fewer work for a competitor and admittedly

hold a grudge against GFI (see Fewer Aff. ¶¶ 3-4), making his testimony inherently suspect, but

Fewer also has an active personal interest in invalidating GFI's liquidated damages clauses:

Fewer is presently engaged in litigation against GFI's parent company, GFI Group Inc.

("GIFG") in which GFIG seeks, among other things, to enforce restrictive covenants against

Fewer that call for the payment of liquidated damages. (GFI Post-Hr'g Mem. 7; Hr'g Tr. 82:15-

25; 94:23-95:1.)

As a result, there is no basis to find that GFI had any subjective punitive intention and

Santana's attempt to invalidate the provision on this ground is unavailing.

## VI.    Additional Factors Supporting Enforceability

In addition to Santana's failure to present evidence sufficient to meet his burden to

establish unreasonableness, several additional factors support the enforceability of this liquidated

damages clause. First, much of the historic "[h]ostility to liquidated damages clauses reflects a

concern that such clauses are often unconscionably imposed by the stronger, or more

sophisticated party on the weaker." Jordache Enter., Inc. v. Global Union Bank, 688 F. Supp.

939, 944 (S.D.N.Y. 1988). Accordingly, many courts have looked to the parties' respective

bargaining positions – including the parties' sophistication, whether the transaction was at arms'

length, and whether the parties were represented by counsel – in evaluating the reasonableness of

liquidated damages clauses. See e.g., Howard Johnson Int'l Inc. v. HBS Family, Inc., No. 96

---

[8] Santana's attempt (Santana Post-Hr'g Mem. 13-15) to explain away the discrepancy in
Fewer's statements then and now are unavailing. The procedural posture of that case and the
reasons why liquidated damages were addressed in the affidavit are irrelevant to the central fact
damaging Fewer's credibility: that he previously stated that GFI's liquidated damages provisions
were inserted "in order to address the projected loss of revenue GFI would suffer in the event" of
a breach but now claims the contrary.

16

Civ. 7687, 1998 WL 411334, at *6 (S.D.N.Y. July 22, 1998) (citing cases).  Of course, this

consideration is not dispositive, as "a court must not enforce an otherwise invalid liquidated

damages provision merely because it was freely negotiated by sophisticated counsel."  In re

Ionosphere Clubs, Inc., 262 B.R. at 617.  Nevertheless, the attendant circumstances here do not

suggest a situation fraught with possible overreaching.

Santana is a sophisticated businessman who discussed the entire Agreement, including

the liquidated damages provision, with Brown, who was at the time Santana's manager, and

Brown suggested that Santana review the document with an attorney prior to its execution.

(Brown Aff. ¶ 3; Hr'g Tr. 101:7-13; 103:22-105:2.)  Although Santana may not have actually

consulted with counsel prior to signing the Agreement (Hr'g Tr. 42:2-7), it is apparent that he

had ample opportunity to do so and in fact was represented at the time by attorney Kerry

Flowers, who regularly provided Santana with general business advice, including advice

concerning employment agreements, throughout the course of his employment with GFI.

(Flowers Tr. 9-11, Brown Aff. Ex. B.)  Although Santana may have made the decision not to call

upon his attorney's counsel in this instance, this is not the type of situation courts should worry

about in which a powerful corporation overreaches to impose an unjustifiable penalty on a

hapless individual.

Relatedly, at the heart of the concern with penalty clauses is that they operate "in

terrorem" to "deter breach through compulsion."  Leasing Serv. Corp. v. Justice, 673 F.2d 70, 73

(2d Cir. 1982).  Faced with the prospect of having to pay exorbitant damages, "[a] promisor

would be compelled, out of fear of economic devastation, to continue performance and his

promisee, in the event of default, would reap a windfall well above actual harm sustained."

Truck Rent-A-Center, 41 N.Y.2d at 424; accord, Leasing Serv. Corp., 773 F.2d at 73.  As a

17

result, the courts will not "permit parties, in their unbridled discretion, to utilize penalties as damages" to prevent this "terrible oppression in pecuniary dealings." Truck Rent-A-Center, 41 N.Y.2d at 424.

Here, there is no evidence tending to suggest oppressive forces at work. To the contrary, the anecdotal evidence presented reveals that similar liquidated damages clauses are widely utilized in the industry and yet there remains a healthy degree of broker mobility. (See Brown Aff. Exs. D-G; Hr'g Tr. 11:15-12:1; 16:4-18:12; 22:6-10; 47:7-48:13.)[9] Moreover, the fact that similar liquidated damages clauses are prevalent in the industry itself further supports a finding of reasonableness here. Although certainly not dispositive – it is possible that the entire industry engages in *un*reasoanble behavior – "[g]eneral industry standards or customs may also be helpful in deciding whether a liquidated-damages clause is reasonable." Koylum, Inc. v. Peksen Realty Corp., No. 99 CV 3793, 2004 WL 5599307, at *8 (E.D.N.Y. Dec. 2, 2004); cf. JMD Holding Corp., 4 N.Y.3d at 383 (reasonableness of liquidated damages provision bolstered by fact that it was based on "common feature in [industry agreements] negotiated by sophisticated commercial parties"). That this industry – which undoubtedly has a more intimate understanding than this Court of the nature of the difficult-to-quantify damages flowing from inter-broker competition in violation of contracted-for restrictive covenants – has apparently seen fit to rely on similar liquidated damages clauses using broker revenue stream as a proxy for damages further supports the reasonableness of the liquidated damages provision in Santana's contract.

---

[9] Additionally, not only are these clauses common throughout the industry, but brokers apparently are routinely indemnified by their new employer, further mitigating any potentially oppressive effects such clauses may otherwise produce. (Hr'g Tr. 100:8-19.)

## CONCLUSION

For the foregoing reasons, the liquidated damages clause in Santana's employment contract with GFI is enforceable.  Having throughly reviewed the applicable legal authority, and fully developed the factual record, the Court concludes that actual damages from a breach of the Agreement are difficult to ascertain, and that the sum provided for as liquidated damages is not grossly disproportionate to the damages reasonably anticipated by the parties at the time they entered into the contract.  Rather than operating as a penalty that would unduly coerce Santana's performance, the liquidated damages provided for a reasonable estimate of the expected damages that would result from a breach.

Accordingly, GFI's motion for summary judgment that the liquidated damages clause is enforceable is granted, and Santana's cross-motion for summary judgment that the clause is not enforceable is denied.


SO ORDERED.

Dated: New York, New York
      August 13, 2009

                                      GERARD E. LYNCH
                             United States District Judge